921 P.2d 146

Larry BROWN; Angelica Brown; Drake Alabanza; and Lou Alabanza, Plaintiffs–Appellees,

v.

KFC NATIONAL MANAGEMENT COMPANY, a Delaware Corporation; KFC U.S.A., a Foreign Corporation; Lars Peterson, Defendants–Appellants,

and

Doe Defendants 1–10, Defendants.

No. 18319.

Supreme Court of Hawai'i.

July 19, 1996.

Reconsideration Denied Aug. 27, 1996.

Matt A. Tsukazaki and Ernest C. Moore, III of Torkildson, Katz, Jossem, Fonseca, Jaffe, Moore & Hetherington, on the briefs, Honolulu, for defendants–appellants KFC National Management Company, KFC U.S.A. Incorporated, and Lars Peterson.

David F. Simons, Simons & Associates, and Davis & Levin, on the briefs, Honolulu, for plaintiffs–appellees Drake Alabanza and Lou Alabanza.

John Ishihara, Chief Counsel, Department of Labor and Industrial Relations, on the briefs, Honolulu, for amicus curiae Hawai'i Civil Rights Commission.

Before MOON, C.J., KLEIN, LEVINSON and NAKAYAMA, JJ., and Circuit Court Judge MICHAEL TOWN, in place of RAMIL, J., Recused.

LEVINSON, Justice.

The defendants-appellants KFC National Management Company, KFC U.S.A. Incorporated, and Lars Peterson (collectively, "KFC") appeal from the circuit court's decision and order denying KFC's motion to stay action and to compel arbitration of the claims asserted by the plaintiffs-appellees Drake Alabanza (Drake), a former employee of KFC, and his wife, Lou Alabanza (Lou) (collectively, "the Alabanzas") in their complaint filed in the first circuit court. The Alabanzas' claims stem from Drake's allegation that race discrimination was implicated in his termination from employment. KFC asserts its right to compel arbitration of all the claims raised by the Alabanzas based on an arbitration agreement that was reflected in an appli-

cation for employment with KFC that Drake had signed.

On appeal, KFC contends that: (1) the circuit court erred in ruling, as a matter of law, that the arbitration agreement reflected in Drake's employment application was "not an enforceable arbitration clause within the scope of Chapter 658 of the Hawai'i Revised Statutes"; and (2) an arbitration agreement is not unenforceable merely because it is included in an application for employment that disclaims any implied or express contract of employment. The Alabanzas, on the other hand, urge that: (1) the arbitration agreement, if a contract at all, is an unenforceable contract of adhesion; (2) a provision in an arbitration agreement that the Federal Arbitration Act, 9 U.S.C. § 1 et seq. (FAA), would govern the substance of controversies renders the alleged contract for arbitration unenforceable in the employment context; and (3) in any event, Lou is not bound by an arbitration agreement signed only by Drake.

For the reasons set forth below, we hold, as a matter of law: (1) that the arbitration agreement imposed upon Drake by KFC as an adjunct of his employment application is enforceable against Drake and is not an unenforceable contract of adhesion; but (2) that Lou, who did not sign the arbitration agreement, is not bound to arbitrate her claims of loss of consortium and intentional and negligent infliction of emotional distress, which are both derivative and separable.

## I. *BACKGROUND*

In August 1992, Drake applied for a job as a cook with KFC at its Kentucky Fried Chicken store in Wahiawā, City and County of Honolulu, where he had previously worked from 1990 to 1991. As part of the application process, he completed and signed a written standard form application for employment that had been drafted by KFC. On the application, Drake supplied certain personal information, his employment interest, his ed-

ucational background, and his employment history. The employment application also contained a separate section entitled "Agreement." The first two paragraphs of the Agreement stipulated that Drake, if employed, would be an "at will" employee and that the application was not an implied or express contract of employment. The text of the Agreement provided in relevant part as follows:

I agree that I am offered[1] employment by KFC and accept, my employment will be employment at will and not for any specific duration, [and] that my employment and compensation can be terminated, with or without cause, with or without notice, at any time, at the option of either KFC or myself.

I am hereby informed and I understand that nothing contained in this application, any KFC manual, handbook, or other written materials shall constitute an implied or expressed contract of employment. All such materials are presented for informational purposes only and can be changed at any time by KFC, with or without notice. Furthermore, no employee or agent of KFC, other than the Chief Executive Officer, has any authority to enter into any agreement for employment for any specified period of time or to make any agreement contrary to the foregoing and that any such agreements must be in writing and must be signed by the Chief Executive Officer of KFC.

The Agreement also contained a subsection styled "Arbitration Of Employee Rights" (the Employee Rights subsection) and a signature line, which Drake executed. The application was not signed by any agent of KFC. The Employee Rights subsection, in turn, contained an arbitration agreement providing that the applicant agreed to arbitrate any dispute regarding compensation, employment, or termination from employment. The full text of the arbitration agreement was as follows:

1. The application's text evidently contains a typographical error of omission and should read in relevant part that "I agree that *if* I am offered employment...." (Emphasis added.) Both at trial and on appeal, neither party contends that

this section of the agreement constitutes an offer or contract of employment. The context of the entire paragraph, as well as that which follows it, makes the clerical error obvious.

Because of the delay and expense which results from the use of the federal and state court systems, KFC and I agree to submit to binding arbitration any controversies concerning my compensation, employment[,] or termination of employment, rather than to use such court systems. In any such arbitration, the American Arbitration Association rules shall govern the procedure[,] and the Federal Arbitration Act shall govern the substance of such controversies.

In July or August 1992, Drake was hired as a cook for the Kentucky Fried Chicken store in Wahiawā. He worked for KFC until February 25, 1993, when his employment was allegedly terminated.[2] Subsequent to his alleged termination, Drake, who is an African American, filed a complaint with the Hawai'i Civil Rights Commission (HCRC),[3] alleging, *inter alia*, race discrimination and harass-

ment. He received a right-to-sue letter from the HCRC, pursuant to Hawai'i Revised Statutes (HRS) § 368–12 (1993).[4] On December 9, 1993, the Alabanzas, along with the plaintiffs-appellees Larry Brown and his wife, Angelica Brown,[5] filed the lawsuit and jury demand against KFC that has given rise to this appeal, setting forth, *inter alia*, claims for relief arising out of Drake's alleged termination of employment with KFC.

The Alabanzas' lawsuit was premised solely on claims based on alleged violations of state law. In the complaint—which seeks compensatory and punitive damages, injunctive relief, costs, and attorneys' fees—Drake raised claims of race discrimination in violation of HRS chs. 368 (1993) and 378 (1993), including § 378–2 (first and eighth claims for relief),[6] breach of contract (second claim for

---

2. KFC disputes the Alabanzas' allegation that Drake was terminated from his job. However, for purposes of this appeal—which concerns only the enforceability of the arbitration agreement—resolution of the disputed issue is unnecessary.

3. The HCRC has filed an amicus curiae brief in this matter.

4. HRS § 368–12 provides:

 **Notice of right to sue.** The [HCRC] may issue a notice of right to sue upon written request of the complainant. Within ninety days after receipt of a notice of right to sue, the complainant may bring a civil action under this chapter. The [HCRC] may intervene in a civil action brought pursuant to this chapter if the case is of general importance.

 Pursuant to HRS § 368–11(a) (1993), the HCRC has jurisdiction, *inter alia*, "over the subject of discriminatory practices made unlawful by ... part I of [HRS] chapter 378," which includes HRS § 378–2 (1993). HRS § 368–11(d) (1993) provides in relevant part that, "[f]or purposes of [HRS ch. 368,] 'unlawful discriminatory practice' means an unfair discriminatory practice or like terms, as may be used in ... part I of [HRS] chapter 378."

5. The Browns are merely nominal appellees with respect to this appeal. *See* Hawai'i Rules of Appellate Procedure Rules 3(d) and 28(c).

6. HRS § 378–2, which, as a section of HRS ch. 378, pt. I, is incorporated by reference into the substantive and procedural provisions of HRS ch. 368, *see supra* note 4, provides in relevant part:

 **Discriminatory practices made unlawful; offenses defined.** It shall be an unlawful discriminatory practice:

(1) Because of *race*, sex, sexual orientation, age, religion, color, ancestry, disability, marital status, or arrest and court record:

(A) For any employer to ... discharge from employment, or otherwise to discriminate against any individual in compensation or in the terms, conditions, or privileges of employment; [or]

. . . .

(3) For any person whether an employer, employee, or not, to aid, abet, incite, compel, or coerce the doing of any of the discriminatory practices forbidden by this part, or to attempt to do so[.]

(Emphasis added.) These provisions remain unchanged to this day. However, effective June 7, 1994, HRS § 378–2 was amended to prohibit employment discrimination against "a qualified individual because of the known disability of an individual with whom the qualified individual is known to have a relationship or association." 1994 Haw.Sess.L. Act 88, § 1 at 198–99. The amendment is immaterial to the issues presented by this appeal.

HRS § 378–4 (1993) provides in relevant part that "[a]ny individual claiming to be aggrieved by an alleged unlawful discriminatory practice may file with the [HCRC] a complaint in accordance with the procedure established under [HRS] chapter 368."

HRS § 378–5 (1993) provides in relevant part:

 **Remedies.**

 . . . .

 (b) In any civil action brought under this part, if the court finds that a respondent has engaged in or is engaging in any unlawful discriminatory practice, the court may enjoin the respondent from engaging in such unlawful discriminatory practice and order such affirmative action as may

relief), tortious breach of contract (third claim for relief), negligence (sixth claim for relief), and negligent and intentional infliction of emotional distress (fifth claim for relief). Lou raised derivative claims of loss of consortium (fourth claim for relief) and negligent and intentional infliction of emotional distress (fifth claim for relief). The Alabanzas are not parties to the seventh claim for relief, in which Larry Brown alleges a violation of the Hawai'i Whistleblowers' Protection Act, HRS § 378-61 et seq. (1993).

On January 10, 1994, KFC removed the action to the United States District Court for the District of Hawai'i on the ground of diversity jurisdiction within the meaning of 28 U.S.C. § 1332(a). The district court remanded the matter to the circuit court by order dated April 4, 1994, for lack of diversity of citizenship. *See Mathewson v. Aloha Airlines, Inc.,* 82 Hawai'i 57, 70–71, 919 P.2d 969, 982–83 (1996) (describing the federal statutory scheme governing removal and remand).

On June 23, 1994, KFC filed a motion in the circuit court to stay the action and to compel compliance on the Alabanzas' part with the arbitration agreement (the "motion to compel"). In support of the motion to compel, KFC argued that, because Drake had been hired pursuant to the employment application that he had executed and tendered to KFC, the circuit court should, as a matter of law, enforce the arbitration agreement contained therein and stay the Alabanzas' lawsuit pursuant to HRS § 658-3 (1993). The motion to compel was heard and argued on July 14, 1994, following which the circuit court orally denied the motion, ruling from the bench in the following manner:

THE COURT: The provision in the Plaintiff Alabanza's employment application is not an enforceable arbitration clause within the scope of Chapter 658 of the Hawai'i Revised Statutes; and on that basis, the motion by Defendants KFC Na-

tional Management Company, KFC U.S.A. Incorporated and Lars Peterson for stay of action by the plaintiffs in this case to compel arbitration is denied.

On August 12, 1994, the circuit court entered its written order denying the motion to compel. On the same day, KFC filed a timely notice of appeal.

## II. *STANDARD OF REVIEW*

 A petition to compel arbitration is reviewed *de novo. Dines v. Pacific Ins. Co., Ltd.,* 78 Hawai'i 325, 326, 893 P.2d 176, 177, *reconsideration denied,* 78 Hawai'i 474, 896 P.2d 930 (1995). *See also Shimote v. Vincent,* 80 Hawai'i 96, 99, 905 P.2d 71, 74 (App.), *cert. denied,* 80 Hawai'i 187, 907 P.2d 773 (1995). The standard is the same as that which would be applicable to a motion for summary judgment, and the trial court's decision is reviewed "using the same standard employed by the trial court and based upon the same evidentiary materials as were before [it] in determination of the motion." *Koolau Radiology, Inc. v. Queen's Medical Center,* 73 Haw. 433, 439–40, 834 P.2d 1294, 1298 (1992) (citation and internal quotation marks omitted); *see also Cuba v. Fernandez,* 71 Haw. 627, 631, 801 P.2d 1208, 1211 (1990); *First Hawaiian Bank v. Weeks,* 70 Haw. 392, 396, 772 P.2d 1187, 1190 (1989); *Feliciano v. Waikiki Deep Water, Inc.,* 69 Haw. 605, 607, 752 P.2d 1076, 1078 (1988).

## III. *DISCUSSION*

A. *Based On The Plain Language Of The Arbitration Agreement And Federal Preemption Law, The Federal Arbitration Act Governs The Enforceability Of The Arbitration Agreement.*

### 1. *Statement of the problem*

Although the Alabanzas characterize the circuit court's order as having determined that the employment application was not a

---

be appropriate, which may include, but is not limited to, reinstatement, hiring, or upgrading of employees, with or without backpay, ... or any other equitable relief the court deems appropriate. Backpay liability shall not accrue from a date more than two years prior to the filing of the complaint with the [HCRC].

(c) In any action brought under this part, the court, in addition to any judgment awarded to the plaintiff or plaintiffs, shall allow costs of action, including costs of fees of any nature and reasonable attorney's fees, to be paid by the defendant.

written contract, KFC is correct that neither the transcripts of the hearing on its motion to compel nor the court's subsequent written order denying the motion reveal such a specific finding. As we have indicated, the circuit court simply ruled that the applicable provision in Drake's employment application was "not an enforceable arbitration clause within the scope of Chapter 658 of the Hawai'i Revised Statutes." Whatever the underlying analysis may have been, the circuit court premised its order on an interpretation of Hawai'i law. However, the terms of the arbitration agreement itself and relevant federal case law establish that the FAA governs the enforceability of arbitration in the present case.

Under the common law, agreements to arbitrate were not enforceable. *Yoshioka v. E.F. Hutton & Co.*, 2 Haw.App. 125, 126, 626 P.2d 1186, 1187 (1981) (citation omitted). Parties could agree to arbitrate an existing controversy, but either party could freely revoke or abrogate such an agreement at any time prior to the entry of a final arbitration award. *Textile Workers Union v. Lincoln Mills of Alabama*, 353 U.S. 448, 466, 77 S.Ct. 912, 926, 1 L.Ed.2d 972 (1957) (Frankfurter, J., dissenting). Over the course of time, however, both federal and state law have evolved to the point where the enforceability of arbitration agreements has been expressly approved.

Hawai'i has codified its endorsement of the enforceability of arbitration agreements in HRS ch. 658 (1993). This court has previously held that "under [Hawai'i's] arbitration statute, before parties to a lawsuit can be ordered to arbitrate pursuant to Hawai'i Revised Statutes (HRS) § 658–3, HRS § 658–1 requires that an enforceable, valid, and irrevocable agreement, in writing, exists." *Koolau Radiology, Inc.*, 73 Haw. at 439, 834 P.2d at 1298. In this connection HRS § 658–1 provides in relevant part that "[a] provision *in a written contract* to settle by arbitration a controversy thereafter *arising out of the contract* . . . shall be valid, enforceable, and irrevocable save only upon such grounds as exist for the revocation of any contract." (Emphases added.) [7]

Significantly, the present dispute arises out of an employment relationship established pursuant to an oral, unwritten contract of employment. It is not surprising that the circuit court grounded its refusal to enforce the present arbitration agreement in a statutory analysis of HRS § 658–1, inasmuch as it was invited to do so by the parties. KFC's motion to compel, the Alabanzas' responsive memorandum in opposition, and the oral argument on the motion all focused exclusively on Hawai'i law and policy. Indeed, the Alabanzas declared in their memorandum in opposition that "[i]t is axiomatic that the issue before this Court is a question to be decided pursuant to [Hawai'i] State law and not Federal law." The Alabanzas, however, cited no authority for their "axiom."

The relevance of the FAA to the present case was first raised on appeal in KFC's opening brief, in which KFC argued that the arbitration agreement is enforceable under

---

7. Although—in light of our holding, *infra*, that Hawai'i law, in and of itself, does not ultimately govern the present dispute—we do not reach the issue, HRS § 658–1 could be construed to require that a dispute subject to arbitration must relate to terms that are expressly contained within a *written* contract and that are separate and distinct from the arbitration provision itself. Our decision today expresses no view regarding whether HRS § 658–1 necessitates such an underlying *written* contract. We are aware, however, that, under Hawai'i law, statutory interpretations that favor arbitration are generally preferred. "This court has long recognized the strong public policy supporting Hawai'i's arbitration statutes as codified in HRS Chapter 658." *Bateman Constr., Inc. v. Haitsuka Bros., Ltd.*, 77 Hawai'i 481, 484, 889 P.2d 58, 61, *reconsideration denied*, 78 Hawai'i 421, 895 P.2d 172 (1995). We have stated that "the proclaimed public policy of our legislature is to encourage arbitration as a means of settling differences and thereby avoid litigation." *Gregg Kendall & Assoc. v. Kauhi*, 53 Haw. 88, 93, 488 P.2d 136, 140 (1971) (citations omitted). *See also Lee v. Heftel*, 81 Hawai'i 1, 4, 911 P.2d 721, 724 (1996); *Westin Hotel v. Universal Inv., Inc.*, 72 Haw. 178, 183, 811 P.2d 467, 469, *reconsideration denied*, 72 Haw. 617, 841 P.2d 1074 (1991); *Association of Owners of Kukui Plaza v. Swinerton & Walberg Co.*, 68 Haw. 98, 107, 705 P.2d 28, 35, *reconsideration denied*, 68 Haw. 687, 705 P.2d 28 (1985); *Gadd v. Kelley*, 66 Haw. 431, 436, 667 P.2d 251, 255 (1983); *Oahuan, Ltd. v. Trustees of the Violet K. Maertens Trust Estate*, 4 Haw.App. 295, 298, 666 P.2d 603, 605 (1983).

both HRS ch. 658 and the FAA. The Alabanzas' answering brief cited the FAA only within the context of its argument that the inclusion of the FAA in the arbitration agreement vitiated the agreement's enforceability.

Both KFC's and the Alabanzas' arguments are inapposite to some degree, however, because the outcome of the present appeal turns, in the first instance, on the application of federal law.[8] Our view in this regard is based on a review of the arbitration agreement itself and federal case law mandating that the FAA is applicable to disputes such as that before us. The issues raised on appeal—in particular, the application of the FAA to disputes in the employment context—appear to be questions of first impression in this jurisdiction.

### 2. The arbitration agreement and the FAA

■ As indicated, the. arbitration agreement between Drake and KFC expressly provided that the FAA would govern any controversies concerning termination of Drake's employment.[9] As this court has previously stated,

> [o]ne of the prime objectives of contract law is to protect the justified expectations of the parties. When the parties choose the law of a particular [jurisdiction ] to govern their contractual relationship and the chosen law has some nexus with the parties or the contract, that law will generally be applied.

*Airgo, Inc. v. Horizon Cargo Transp., Inc.,* 66 Haw. 590, 595, 670 P.2d 1277, 1281 (1983) (citing Restatement (Second) of Conflict of Laws § 187(1) (1971)). Thus, the arbitration agreement itself would favor the application of the FAA to the present dispute if there is a sufficient nexus between the federal statute and either the parties or the essential nature of their contractual relationship.

The FAA, which is the law recited in the arbitration agreement, has a clear bearing on any arbitration contract. Its "basic purpose ... is to overcome courts' refusals to enforce agreements to arbitrate." *Allied–Bruce Terminix Cos., Inc. v. Dobson,* —— U.S. ——, ——, 115 S.Ct. 834, 838, 130 L.Ed.2d 753 (1995) (citation omitted). Moreover, KFC National Management Company and KFC U.S.A., being nationally based foreign corporations doing business in Hawai'i, could reasonably look to federal law as a logical vehicle for ensuring uniformity in the maintenance of employer-employee relations throughout their multistate operations. Accordingly, there is "some nexus" between the FAA and the contractual relationship between KFC and its employees.

In any event, even if the arbitration agreement did not reflect an intent that the FAA should govern employment-related disputes between KFC and Drake, we would be compelled to address the question whether the FAA has preempted any state law that is in conflict with it. Accordingly, we do so now.

This court has acknowledged that "[w]hether a state law ... is preempted in a given case is a question of congressional intent." *Norris v. Hawaiian Airlines, Inc.,* 74 Haw. 235, 245–246, 842 P.2d 634, 639 (1992) (citing *Allis–Chalmers Corp. v. Lueck,* 471 U.S. 202, 208, 105 S.Ct. 1904, 1909, 85 L.Ed.2d 206 (1985)), *aff'd,* 512 U.S. 246, 114 S.Ct. 2239, 129 L.Ed.2d 203 (1994). In a trilogy of cases decided in consecutive years, the United States Supreme Court has explicated the underlying purpose and congressional intent of the FAA.

In *Moses H. Cone Memorial Hosp. v. Mercury Constr. Corp.,* 460 U.S. 1, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983), the United States Supreme Court reviewed a decision of the United States Court of Appeals for the Fourth Circuit ordering arbitration of a dispute between a hospital and its contractor

---

**8.** We note that, even when applying Hawai'i law in the area of arbitration enforcement—inasmuch as HRS § 658–3 is virtually identical to the language of the parallel federal arbitration statute, 9 U.S.C. § 4—, "when faced with a motion to compel arbitration, we look to federal authority for guidance." *Koolau Radiology, Inc.,* 73 Haw. at 444, 834 P.2d at 1300. *See also Bateman Constr.,* 77 Hawai'i at 485, 889 P.2d at 62;

*Salud v. Financial Sec. Ins. Co.,* 7 Haw.App. 329, 333, 763 P.2d 9, 11, *cert. denied,* 70 Haw. 664, 796 P.2d 501 (1988).

**9.** We address the question whether the arbitration agreement is itself a binding contract *infra* in section III.C. of this opinion.

concerning building construction costs. Although their contract contained a binding arbitration clause, the hospital sought to stay arbitration and obtain a declaratory judgement in a state court regarding its financial obligations to the contractor. The state court granted the stay, as did the federal district court. The Fourth Circuit reversed and remanded with instructions to enter an order to arbitrate. The Supreme Court affirmed, ruling as follows:

> [9 U.S.C. § 2 of the FAA] is a congressional declaration of a liberal federal policy favoring arbitration agreements, notwithstanding any state substantive or procedural policies to the contrary. The effect of the section is to create a body of federal substantive law of arbitrability, applicable to any arbitration agreement within coverage of the [FAA].

*Moses H. Cone Memorial Hosp.*, 460 U.S. at 24, 103 S.Ct. at 941 (footnote omitted).

In *Southland Corp. v. Keating*, 465 U.S. 1, 104 S.Ct. 852, 79 L.Ed.2d 1 (1984), the Supreme Court ruled that Congress intended that the substantive provisions of the FAA would control actions commenced in either federal or state courts, noting that, "[i]n creating a substantive rule applicable in state as well as federal courts, Congress intended to foreclose state legislative attempts to undercut the enforceability of arbitration agreements." *Southland Corp.*, 465 U.S. at 16, 104 S.Ct. at 861 (footnotes omitted).[10]

■ Finally, in *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 105 S.Ct. 1238, 84 L.Ed.2d 158 (1985), the Supreme Court considered the practice, adopted in some federal circuits, of denying arbitration when arbitrable pendent state law claims were "intertwined"[11] with non-arbitrable federal claims triable in federal court. Rejecting the practice, the *Byrd* Court reaffirmed its established position that Congress intended that the FAA apply to claims arising under state

law, whether umbilically connected to federal claims or not:

> The preeminent concern of Congress in passing the [FAA] was to enforce private agreements into which parties had entered, and that concern requires that we rigorously enforce agreements to arbitrate, even if the result is "piecemeal" litigation, at least absent a countervailing policy manifested in another federal statute.

*Byrd*, 470 U.S. at 221, 105 S.Ct. at 1242–43.

Virtually every state and federal court that has considered the preemptive effect of the FAA has concluded that, in light of the Supreme Court's decisions cited above, the FAA applies equally in state or federal courts. *See, e.g., Robert Lawrence Co. v. Devonshire Fabrics, Inc.* 271 F.2d 402, 404–407 (2d Cir.1959); *American Airlines, Inc. v. Louisville & Jefferson County Air Bd.* 269 F.2d 811, 815–816 (6th Cir.1959); *Main v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 67 Cal.App.3d 19, 136 Cal.Rptr. 378, 381 (1977); *West Point–Pepperell, Inc. v. Multi–Line Indus.*, 231 Ga. 329, 201 S.E.2d 452, 453 (1973); *Pathman Constr. Co. v. Knox County Hosp. Ass'n*, 164 Ind.App. 121, 326 N.E.2d 844, 851 (1975); *Skewes v. Shearson Lehman Bros.*, 250 Kan. 574, 829 P.2d 874, 878–879 (1992); *In re J. Ludwig Mowinckels Rederi v. Dow Chem. Co.*, 25 N.Y.2d 576, 307 N.Y.S.2d 660, 664, 255 N.E.2d 774, 778, *cert. denied*, 398 U.S. 939, 90 S.Ct. 1844, 26 L.Ed.2d 272 (1970); *Cooper v. Computer Credit Sys., Inc.*, 40 A.D.2d 692, 336 N.Y.S.2d 380, 381 (1972); *Aerojet–General Corp. v. Non–Ferrous Metal Ref., Ltd.*, 37 A.D.2d 531, 322 N.Y.S.2d 33, 34 (1971); *Miller v. Puritan Fashions Corp.*, 516 S.W.2d 234, 238 (Tex.Civ.App.1974); *Mamlin v. Susan Thomas, Inc.*, 490 S.W.2d 634, 637 (Tex.Civ. App.1973); *REA Express v. Missouri Pac. R.R. Co.*, 447 S.W.2d 721, 726 (Tex.Civ.App. 1969); *Pinkis v. Network Cinema Corp.*, 9 Wash.App. 337, 512 P.2d 751, 755 (1973).

---

**10.** In *Allied–Bruce Terminix Cos.*, —— U.S. at ——–——, 115 S.Ct. at 838–39, the Supreme Court refused to overrule *Southland*, reasserting the preemptive nature of the FAA with respect to state law. *See also Perry v. Thomas*, 482 U.S. 483, 107 S.Ct. 2520, 96 L.Ed.2d 426 (1987).

**11.** According to the "doctrine of intertwining," "when arbitrable and nonarbitrable claims arise out of the same transaction, and are sufficiently intertwined factually and legally, the district court ... may in its discretion deny arbitration as to the arbitrable claims and try all the claims together in federal court." *Byrd*, 470 U.S. at 216–17, 105 S.Ct. at 1240 (footnote omitted).

Neither the Alabanzas nor the HCRC, *see supra* note 3, cite any contrary authority.[12]

Thus, the Alabanzas' "axiom"—that the issue before this court is a question to be decided pursuant to state law—is not apodictic. Indeed, their argument—intended to support their contention that state law is outcome-dispositive of the present appeal—that their "complaint was filed in State court alleging causes of action based on Hawai'i State law" merely begs the question. After all, the plaintiffs in *Southland Corp.* were franchisees of 7–Eleven convenience stores, who, like the Alabanzas, were asserting claims based exclusively on state common and statutory law. Nevertheless, *Southland Corp.* definitively established the applicability of the FAA to claims subject to arbitration, whether brought in a federal or state court. Observing that a contrary result would "encourage and reward forum shopping," the *Southland Corp.* Court explained its rationale as follows:

> We are unwilling to attribute to Congress the intent . . . to create a right to enforce an arbitration contract and yet make the right dependent for its enforcement on the particular forum in which it is asserted. And since the overwhelming proportion of all civil litigation in this country is in the state courts, we cannot believe Congress intended to limit the [FAA] to disputes subject only to *federal*-court jurisdiction. Such an interpretation would frustrate congressional intent to place "[a]n arbitration agreement . . . upon the same footing as other contracts, where it belongs." H.R.Rep. No. 96, 68th Cong., 1st Sess., 1 (1924).

*Southland Corp.*, 465 U.S. at 15–16, 104 S.Ct. at 860–61 (footnotes omitted) (emphasis in original).

Equally misplaced is the Alabanzas' argument that the federal district court's order

remanding their lawsuit to the state court for lack of diversity of citizenship, within the meaning of 28 U.S.C. § 1332(a), implies that federal law is immaterial to their appeal for all purposes. The fact remains that the FAA "creates a body of federal substantive law establishing and regulating the duty to honor an agreement to arbitrate," despite the concurrent fact that it "does not create any independent federal-question jurisdiction under 28 U.S.C. § 1331 . . . or otherwise." *Moses H. Cone Memorial Hosp.*, 460 U.S. at 25 n. 32, 103 S.Ct. at 942 n. 32.

Given the foregoing analysis, it is apparent that the applicability of the FAA is the same with respect to state and federal claims and whether such claims are pursued in state or federal court. That being the case, and assuming that the arbitration agreement is a valid and binding contract, *see supra* note 9, we hold that the FAA, which is expressly enumerated in the arbitration agreement, governs the obligation of the parties to that agreement—KFC and Drake—to arbitrate their employment-related disputes.

B. *The FAA's Exclusionary Clause Relating To "Contracts Of Employment" Does Not Apply To Drake's Employment Relation With KFC.*

■ The Alabanzas contend that the FAA does not apply to the present dispute, arising as it does from "a contract of employment," because the FAA itself "specifically refuses to require arbitration of disputes arising out of employment contracts." The phrase "contract of employment," however, is a cryptic one and a term of art in FAA jurisprudence, deriving from the last sentence of 9 U.S.C. § 1, which provides in relevant part that "nothing herein contained shall apply to *contracts of employment* of seamen, railroad employees or any other class of workers

---

12. The only reservation regarding the applicability of part of the FAA to the state courts was expressed by the *Cone* Court, which observed that § 4 of the FAA expressly relates to petitions directed to "any United States district court." *Moses H. Cone Memorial Hosp.*, 460 at 26 & n. 35, 103 S.Ct. at 943 & n. 35. The *Cone* Court therefore made the observation that, although "state courts, as much as federal courts, are obliged to grant stays under § 3 of the [FAA]," it

was "less clear . . . whether the same is true of an order to compel arbitration under § 4 of the Act." *Id.* at 26, 103 S.Ct. at 942. However, the appellate courts in California and most other jurisdictions have held that the FAA is generally applicable to proceedings in state courts arising out of transactions affecting interstate commerce. *See Main*, 136 Cal.Rptr. at 381, and the cases cited therein.

engaged in foreign or interstate commerce" [hereinafter, "the section 1 exclusion"]. (Emphasis added.)

The Alabanzas acknowledge that the section 1 exclusion has been interpreted narrowly to apply only to seamen, railway workers, or workers directly engaged in foreign or interstate commerce. They argue, however, that a broader interpretation of the section 1 exclusion is more apt. Because, consistent with the overwhelming weight of federal authority, we believe that the narrow interpretation of the section 1 exclusion is correct, we disagree.

In *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 111 S.Ct. 1647, 114 L.Ed.2d 26 (1991), the Supreme Court expressly declined to address whether particular contracts of employment are subject to the FAA under the section 1 exclusion. *Gilmer*, 500 U.S. at 25 n. 2, 111 S.Ct. at 1651 n. 2. However, many other federal courts, construing the section 1 exclusion narrowly, have held that the FAA governs a variety of employment contracts.

As far as we can tell, the first analysis of the section 1 exclusion by a federal appellate court appears in *Tenney Eng'g, Inc. v. United Elec. Radio & Mach. Workers of Am., Local 437*, 207 F.2d 450 (3d Cir.1953). The *Tenney* court noted that the only reference to the section 1 exclusion in the relevant legislative history appeared in a report prepared by the American Bar Association's Committee on Commerce, Trade and Commercial Law, which addressed objections to the FAA raised by the Seamen's Union. *Id.* at 452. It seems that the seamen had originally objected to passage of the FAA, arguing that, because disputes relating to their wages were subject to federal admiralty jurisdiction, they should not be compelled to arbitrate them. *Id.* In order to eliminate this opposition, the drafters of the FAA added the section 1 exclusion to the language of 9 U.S.C. § 1. *Id.* Given that background,

the *Tenney* court construed the section 1 exclusion as follows:

It thus appears that the draftsmen of the [FAA] were presented with the problem of exempting seamen's contracts. Seamen constitute a class of workers as to whom Congress had long provided machinery for arbitration. In exempting them[,] the draftsmen excluded also railroad employees, another class of workers as to whom [a] special procedure for the adjustment of disputes had previously been provided. Both these classes of workers were engaged directly in interstate or foreign commerce. To these the draftsmen of the [FAA] added "any other class of workers engaged in foreign or interstate commerce." We think that the intent of the latter language was, under the rule of ejusdem generis,[13] to include only those other classes of workers who are likewise engaged directly in commerce, that is, only those other classes of workers who are actually engaged in the movement of interstate or foreign commerce or in work so closely related thereto as to be in practical effect part of it. The draftsmen had in mind the two groups of transportation workers as to which special arbitration legislation already existed[,] and they rounded out the exclusionary clause by excluding all other similar classes of workers.

*Id.* at 452–453 (footnotes omitted).

Three years later, the United States Court of Appeals for the Second Circuit applied the same analysis in *Signal–Stat Corp. v. Local 475, United Elec. Radio & Mach. Workers of Am. (UE)*, 235 F.2d 298, 303 (2d Cir.1956) ("The ... employees are not ... actually engaged in interstate and foreign commerce. They are merely engaged in the manufacture of goods for interstate commerce. Therefore, the ... agreement here does not come within the exclusionary clause of Section 1."), *cert. denied*, 354 U.S. 911, 77 S.Ct. 1293, 1 L.Ed.2d 1428 (1957). *See also Erving v. Virginia Squires Basketball Club*, 468 F.2d

---

**13.** Pursuant to the rule of *ejusdem generis,* which is an "established rule of statutory construction, where words of general description follow the enumeration of certain things, those words are restricted in their meaning to objects of like kind and character with those specified." *Jones v.*

*Hawaiian Elec. Co.,* 64 Haw. 289, 294, 639 P.2d 1103, 1108 (1982) (citations and footnote omitted). *See also Richardson v. City and County of Honolulu,* 76 Hawai'i 46, 74, 868 P.2d 1193, 1221, *reconsideration denied,* 76 Hawai'i 247, 871 P.2d 795 (1994) (Klein, J., dissenting).

1064, 1069 (2d Cir.1972) ("In light of the strong national policy in favor of arbitration as a means of settling private disputes[,] we see no reason to give an expansive interpretation to the exclusionary language of Section 1 by reexamining our decision in *Signal–Stat* [.]").

The First, Sixth, and Seventh Circuits have now adopted the foregoing construction of the section 1 exclusion. *See Dickstein v. du Pont,* 443 F.2d 783, 785 (1st Cir.1971) (holding that section 1 exclusion is limited "to employees ... involved in, or closely related to, the actual movement of goods in interstate commerce"); *Asplundh Tree Expert Co. v. Bates,* 71 F.3d 592, 596–602 (6th Cir. 1995) (holding that section 1 exclusion should be narrowly construed to apply only class of workers engaged, in the same manner as seamen and railroad workers, in actual movement of goods in interstate commerce); *Bacashihua v. United States Postal Serv.,* 859 F.2d 402, 405 (6th Cir.1988) (holding that section 1 exclusion applies to class of workers engaging in interstate commerce); *Miller Brewing Co. v. Brewery Workers Local Union No. 9, AFL–CIO,* 739 F.2d 1159, 1162 (7th Cir.1984) (agreeing that section 1 exclusion is limited to workers employed in transportation industry), *cert. denied* 469 U.S. 1160, 105 S.Ct. 912, 83 L.Ed.2d 926 (1985); *Pietro Scalzitti Co. v. International Union of Operating Eng'rs, Local No. 150,* 351 F.2d 576, 579–580 (7th Cir.1965) (holding that section 1 exclusion relates "only to workers engaged in the movement of interstate or foreign commerce"); *cf. Willis v. Dean Witter Reynolds, Inc.,* 948 F.2d 305, 310–311 (6th Cir.1991) (taking position that all collective bargaining agreements are subject to the section 1 exclusion). The Ninth Circuit has not yet ruled on the issue, but a recent district court decision within that circuit has held that the section 1 exclusion "should be narrowly construed to cover only workers directly involved in the interstate transportation of goods." *Golenia v. Bob Baker Toyota,* 915 F.Supp. 201, 203 (S.D.Cal.1996).

Only one circuit appears to have held otherwise. In *United Elec. Radio & Mach. Workers of America v. Miller Metal Prods.,* 215 F.2d 221 (4th Cir.1954), the Fourth Cir-

cuit declined to include workers who were engaged in the production of goods for interstate commerce within the coverage of the FAA. *Id.* at 224. Significantly, the *Miller Metal* court expressly limited its holding to the issue of the applicability of the FAA to collective bargaining agreements. *Id.* In any event, it is questionable whether *Miller Metal* is still good law even in the Fourth Circuit: at least one district court within it has declined to follow the *Miller Metal* decision. *See Kropfelder v. Snap–On Tools Corp.,* 859 F.Supp. 952, 958 (D.Md.1994) ("In the light of the time which has passed since the *Miller Metal* decision, the strong federal policy in favor of arbitration, and the great weight of circuit court authority, this Court is of the view that the Fourth Circuit would not, as of this date, apply the words used in *Miller Metal* so as to exclude § 1's application in all non-collective bargaining contexts, and would instead apply the views expressed by a majority of courts that[,] as to non-collective bargaining contracts[,] the FAA excludes only those workers involved in the interstate transportation of goods.").

We are persuaded by the reasoning of the First, Second, Third, Sixth, and Seventh Circuits, leading to the conclusion that Congress intended that the section 1 exclusion of the FAA should apply only to classes of employees engaged, in the same manner as seamen and railroad workers, in the actual movement of goods in interstate commerce. Accordingly, inasmuch as he does not fall within that class, we hold that the section 1 exclusion does not extend to Drake's "contract of employment" with KFC and that, therefore, the general provisions of the FAA—to the extent that they are otherwise applicable—govern his claims in the matter before us.

C. *Although Not An Employment Contract, The Arbitration Agreement Between Drake Alabanza And KFC Constitutes A Written And Valid Contract To Arbitrate.*

■ We now reach the question whether the arbitration agreement set forth in the Employee Rights subsection of KFC's employment application constitutes a valid contract binding Drake to arbitrate employ-

ment-related disputes—such as those asserted in the complaint at issue in this case—with KFC. For the reasons discussed below, we hold that it does.[14]

■ "[W]hen presented with a motion to compel arbitration, the court is limited to answering two questions: 1) whether an arbitration agreement exists between the parties; and 2) if so, whether the subject matter of the dispute is arbitrable under such agreement." *Koolau Radiology, Inc.*, 73 Haw. at 445, 834 P.2d at 1300. *See also Lee v. Heftel*, 81 Hawai'i 1, 3, 911 P.2d 721, 723 (1996); *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth*, 473 U.S. 614, 626, 105 S.Ct. 3346, 3353, 87 L.Ed.2d 444 (1985) ("[T]he first task of a court asked to compel arbitration of a dispute is to determine whether the parties agreed to arbitrate that dispute. The court is to make this determination by applying the 'federal substantive law of arbitrability, applicable to any arbitration agreement within the coverage of the [FAA].' ") (Quoting, in part, *Moses H. Cone Memorial Hosp.*, 460 U.S. at 24, 103 S.Ct. at 941.) Although their terms are not identical, both the FAA and HRS ch. 658 interpose a written and otherwise valid contract to arbitrate as a precondition to enforcement. 9 U.S.C. §§ 2 and 4; *Koolau Radiology, Inc.*, 73 Haw. at 439, 834 P.2d at 1298.

**14.** In this connection, the Alabanzas argue that Drake cannot be required to arbitrate his statutory claims of unlawful race discrimination (first and eighth claims for relief), in violation of HRS chs. 368 and 378, because (1) as a matter of public policy, Hawai'i law favors a judicial forum for the effectuation of the purposes underlying its antidiscrimination statutes, and (2) HRS § 368–12 (1993) expressly accords him a "right to sue." Implicit in the Alabanzas' argument, of course, is Drake's consistent position that, insofar as he never contractually agreed to arbitrate *any* employment-related controversy, he never agreed to arbitrate claims of unlawful race discrimination. However, in light of our holdings that (1) the FAA governs KFC's and Drake's obligations to arbitrate their employment-related disputes, *see* sections III.A. and B. of this opinion, *supra*, (2) the arbitration agreement between Drake and KFC is a valid "written agreement for arbitration" within the meaning of the FAA, *see* section III.C.2. of this opinion, *infra*, (3) the arbitration agreement contractually bound Drake and KFC to arbitrate such employment-related controversies as might arise out of Drake's termination, *see*

### 1. *The arbitration agreement is a written contract to arbitrate.*

The Alabanzas contend that there is no valid contract between Drake and KFC compelling Drake to arbitrate anything. Their position, however, is grounded in the proposition that Drake's employment relation with KFC never derived from a written contract, a premise that KFC readily concedes. Indeed, as noted above, KFC insists that the employment application executed by Drake was, by its plain language, in no way an employment contract and that Drake's status was that of an employee at will.

Inasmuch as we have held that, if the arbitration agreement is a legitimate contract, Drake's claims are governed by the FAA, the question becomes whether the arbitration agreement in fact constitutes a written and otherwise valid contract to arbitrate. Section 2 of the FAA provides in relevant part that "a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. Moreover, section 4 of the FAA mandates that the arbitration contract described in section 2 be "a written agreement." 9 U.S.C. § 4. Thus, in contrast with HRS § 658–1,[15]

section III.E.4. of this opinion, *infra*, and (4) the arbitration agreement is not an unenforceable contract of adhesion under either Hawai'i or federal law, *see* section III.F.3. of this opinion, *infra*, the Alabanzas' argument directed specifically at the first and eighth claims for relief, as set forth in their complaint, is without merit.

**15.** To the extent that access to arbitration under HRS ch. 658 is more restrictive than that accorded by the FAA, HRS ch. 658 is preempted by the FAA with respect to contracts falling within the FAA's ambit. *See Norris*, 74 Haw. at 245, 842 P.2d at 639 (" 'Preemption occurs when Congress, in enacting a federal statute, expresses a clear intent to preempt state law, when there is outright or actual conflict between federal and state law.' " (quoting *Louisiana Public Serv. Comm'n v. FCC*, 476 U.S. 355, 368, 106 S.Ct. 1890, 1898, 90 L.Ed.2d 369 (1986)); *Doctor's Associates, Inc. v. Casarotto*, —— U.S. ——, ——, 116 S.Ct. 1652, 1656, 134 L.Ed.2d 902 (1996) ("Courts may not . . . invalidate arbitration agreements under state laws applicable *only* to arbitration provisions.") (Emphasis in original

which mandates the existence of "[a] *provision in a written contract* to settle by arbitration a controversy thereafter *arising out of the contract*" (emphases added) as a prerequisite to the arbitrability of a dispute, the FAA merely requires that the arbitration provision, but not necessarily the contract out of which the controversy arises, be in writing.

The foregoing proposition is exemplified in *White–Weld & Co. v. Mosser*, 587 S.W.2d 485 (Tex.Civ.App.1979), *cert. denied*, 446 U.S. 966, 100 S.Ct. 2943, 64 L.Ed.2d 825 (1980), in which the "principal question on appeal [was] whether the trial judge erred in refusing to abate [a lawsuit] pending arbitration pursuant to a written agreement between the parties to arbitrate." *Id.*, 587 S.W.2d at 486. The plaintiff had filed suit against his employer claiming that it owed him commissions for the sale of bonds that he had earned in the course of his employment. *Id.* Significantly, the plaintiff's employment contract with his employer concerning his financial compensation was strictly oral. *Id.* As in the present appeal, the written agreement to arbitrate appeared in the plaintiff's initial employment application. *Id.* The employer's appeal turned on whether the plaintiff's claim was arbitrable pursuant to 9 U.S.C. § 2. The *White–Weld* court held that it was, quoting *Dickstein*, 443 F.2d at 785, for the proposition that "the creation of an employment relationship which involves commerce is a sufficient 'transaction' to fall within section 2 of the [FAA]." *White–Weld*, 587 S.W.2d at 487 (some internal quotation marks omitted). Accordingly, the *White–Weld* court reversed the judgment of the trial court and remanded with instructions that the plaintiff's lawsuit be stayed pending arbitration of the dispute. *Id.* at 488.

The Alabanzas do not dispute that Drake executed a written arbitration agreement.[16] We therefore hold that the arbitration agreement satisfied the "writing" requirement of the FAA. Accordingly, we must ascertain whether the arbitration agreement is a "valid" contract.

2. *The arbitration agreement between Drake and KFC is valid.*

 "As a general rule, the construction and legal effect to be given a contract is a question of law freely reviewable by an appellate court." *Cho Mark Oriental Food, Ltd. v. K & K Int'l*, 73 Haw. 509, 519, 836 P.2d 1057, 1063 (1992); *see also Hanagami v. China Airlines, Ltd.*, 67 Haw. 357, 364, 688 P.2d 1139, 1144 (1984); *Reed & Martin, Inc. v. City and County of Honolulu*, 50 Haw. 347, 348–349, 440 P.2d 526, 527 (1968). The determination whether a contract is ambiguous is likewise a question of law that is freely reviewable on appeal. *MPM Hawaiian, Inc. v. World Square*, 4 Haw.App. 341, 345–346, 666 P.2d 622, 626 (1983) (citing *United States ex rel. Union Bldg. Materials Corp. v. Haas & Haynie Corp.*, 577 F.2d 568 (9th Cir. 1978)). These principles apply equally to appellate review of the construction and legal effect to be given a contractual agreement to arbitrate. *Bateman Constr., Inc. v. Haitsuka Bros., Ltd.*, 77 Hawai'i 481, 485, 889 P.2d 58, 62 (1995); *Koolau Radiology, Inc.*, 73 Haw. at 447, 834 P.2d at 1301; *Simbajon v. Gentry*, 81 Hawai'i 193, 197, 914 P.2d 1386, 1390 (App.1996).

The arbitration agreement in the present case is manifestly unambiguous in its expressed intent that employment-related disputes be arbitrated rather than resolved via resort to the federal or state court systems. Indeed, no other construction could be accorded the recitation that "KFC and [Drake] agree to submit to binding arbitration any controversies concerning [Drake's] compensation, employment[,] or termination of employment[.]" Moreover, the agreement is supported by the bilateral consideration that Drake and KFC would forego their respec-

and citations omitted.)); *Southland Corp*, 465 U.S. at 16, 104 S.Ct. at 861.

**16.** The Alabanzas call attention to the fact that the application is not executed by a representative of KFC. However, while it is true that 9 U.S.C. § 2 of the FAA "requires that an agreement to arbitrate be in writing ..., 'it does not require that the writing be signed by the parties.'" *Nghiem v. NEC Elec., Inc.*, 25 F.3d 1437, 1439 (9th Cir.) (quoting *Genesco, Inc. v. T. Kakiuchi & Co.*, 815 F.2d 840, 846 (2d Cir.1987)), *cert. denied*, —— U.S. ——, 115 S.Ct. 638, 130 L.Ed.2d 544 (1994).

tive rights to a judicial forum, given "the delay and expense which results from the use of the federal and state court systems," in order to benefit from the resulting time and cost savings.

■■■ Thus, on its face, the "written agreement for arbitration," *see* 9 U.S.C. § 4, reflects both mutual assent to the arbitration of employment-related disputes and consideration for that mutual assent. "[I]t is fundamental that terms of a contract should be interpreted according to their plain, ordinary and accepted use in common speech, unless the contract indicates a different meaning." *Amfac, Inc. v. Waikiki Beachcomber Inv. Co.*, 74 Haw. 85, 108, 839 P.2d 10, 24, *reconsideration denied*, 74 Haw. 650, 843 P.2d 144 (1992) (citation and internal quotation marks omitted). Correlatively, "[i]n construing a contract, a court's principal objective is to ascertain and effectuate the intention of the parties as manifested by the contract in its entirety. If there is any doubt, the interpretation which most reasonably reflects the intent of the parties must be chosen." *University of Hawaii Professional Assembly v. University of Hawaii*, 66 Haw. 214, 219, 659 P.2d 720, 724 (1983) (citations and internal quotation marks omitted). Finally, the FAA "was designed ... to place arbitration agreements upon the same footing as other contracts[.]" *Scherk v. Alberto–Culver Co.*, 417 U.S. 506, 510–11, 94 S.Ct. 2449, 2453, 41 L.Ed.2d 270 (1974) (citations and internal quotation marks omitted); *see also Gilmer*, 500 U.S. at 24, 111 S.Ct. at 1651. Applying these principles, we hold that the arbitration agreement is a valid "written agreement for arbitration" within the meaning of the FAA.

D. *Lou Is Not Required To Arbitrate Her Derivative But Separable Claims Against KFC Because She Is Not A Party To The Arbitration Agreement.*

■■■ As we have noted, the Alabanzas' complaint included claims asserted against KFC by Lou for both loss of consortium and negligent and intentional infliction of emotional distress. On appeal, the Alabanzas argue that Lou cannot be compelled to arbitrate her claims because she did not sign the arbitration agreement.[17] KFC, on the other hand, contends that Lou, while not a signatory to the arbitration agreement, is equally bound by its terms. It cites *Barrowclough v. Kidder, Peabody & Co.*, 752 F.2d 923, 938 (3d Cir.1985), *overruled on other grounds in Pritzker v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 7 F.3d 1110 (3d Cir.1993), and *A.L. Williams & Assocs. v. McMahon*, 697 F.Supp. 488, 494 (N.D.Ga.1988), in support of its contention.

The issue generated by the mutually exclusive positions taken by the Alabanzas and KFC is resolved by a determination regarding whether Lou's claims are derivative of Drake's, and, if so, whether they are separable.

■■■ "Derivative" has been defined to mean "[t]hat which has not its origin in itself, but owes its existence to something foregoing." *Black's Law Dictionary* 443 (6th ed. 1990). Under Hawai'i law, a spouse's claim of emotional distress, based on an injury to her husband, is a "derivative" claim sounding

17. The Alabanzas also suggest that, under the circumstances presented, "arbitration ... saves no time or expense, but instead requires both an arbitration and a court proceedings." Apparently, the Alabanzas are implying that, even if some of Drake's claims are held otherwise to be arbitrable, insofar as any of their factually related claims are not, none of their claims should be arbitrated for the sake of judicial efficiency. As discussed *supra* in section III.A.2. of this opinion, however, the United States Supreme Court has rejected the Alabanzas' reasoning. In *Byrd*, the Court decided that when non-arbitrable claims are factually intertwined with pendent state claims that are arbitrable under the FAA, arbitration must be enforced "even if the result is 'piecemeal' litigation...." *Byrd*, 470 U.S. at 221, 105 S.Ct. at 1242–43. As it happens, the *Byrd* Court was simply reaffirming the result reached two years earlier in *Moses H. Cone Memorial Hosp.*, in which the Court ruled that "federal law *requires* piecemeal resolution when necessary to give effect to an arbitration agreement. Under the [FAA], an arbitration agreement must be enforced notwithstanding the presence of other persons who are parties to the underlying dispute but not the arbitration agreement." *Moses H. Cone Memorial Hosp.*, 460 U.S. at 20, 103 S.Ct. at 939 (emphasis in original) (footnotes omitted). Because we deem the reasoning of *Byrd* and *Moses H. Cone Memorial Hosp.* to be controlling, the Alabanzas' argument regarding judicial economy is without merit.

in tort. *First Ins. Co. of Hawaii v. Lawrence,* 77 Hawai'i 2, 17, 881 P.2d 489, 504, *reconsideration denied,* 77 Hawai'i 373, 884 P.2d 1149 (1994). Similarly, "loss of consortium is a derivative action[;] *i.e.,* [an] action by [a] spouse for loss of consortium is derivative of the action for damages by the injured spouse." *Towse v. State,* 64 Haw. 624, 637, 647 P.2d 696, 705 (1982) (citations omitted). *See also Mist v. Westin Hotels,* 69 Haw. 192, 196–200, 738 P.2d 85, 89–91 (1987); *Yamamoto v. Premier Ins. Co.,* 4 Haw.App. 429, 435–436, 668 P.2d 42, 48 (1983), *overruled on other grounds in Doi v. Hawaiian Ins. & Guar. Co.,* 6 Haw.App. 456, 727 P.2d 884 (1986); *Black's Law Dictionary* at 444 (defining "derivative action," *inter alia,* to mean "actions based on injury to another; *e.g.,* action for loss of consortium by husband against third person for injuries to wife").

■ However, as the Hawai'i Intermediate Court of Appeals (ICA) stated in *Yamamoto,* claims such as loss of consortium are "only derivative in the sense that [they do] not arise unless one's spouse has sustained a personal injury. The loss of consortium claim is a claim for damages independent and separate from the spouse's claim for damages." *Yamamoto,* 4 Haw.App. at 435–36, 668 P.2d at 48 (citing *Norwest v. Presbyterian Intercommunity Hosp.,* 52 Or.App. 853, 631 P.2d 1377 (1981), *aff'd,* 293 Or. 543, 652 P.2d 318 (1982), and *Fitzgerald v. Meissner & Hicks, Inc.,* 38 Wis.2d 571, 157 N.W.2d 595 (1968)) (footnote omitted). Thus, while these types of derivative claims are barred when the victim's initial claim of injury cannot be maintained, *Towse,* 64 Haw. at 637, 647 P.2d at 705, and are subject to defenses premised on the injured spouse's contributory or comparative negligence, *see Mist,* 69 Haw. at 199, 738 P.2d at 91, it does not inevitably follow that they must be adjudicated in the same forum as the claims for injury to which they relate or that they are not otherwise separable.

Several federal and state courts have held that certain derivative claims are inseparable from those to which they relate and, on that basis, have obligated the proponents of such derivative claims to arbitrate them when the proponents of the related and underlying claims are contractually bound to do so.

The *Barrowclough* court, for example, addressed claims asserted by a discharged stockbroker, who was a party to a compulsory arbitration agreement and had filed a lawsuit against his former employer for improperly withholding deferred compensation benefits and violating ERISA reporting and fiduciary provisions. The stockbroker was joined in his suit by the contingent beneficiaries of his deferred compensation plan, who were not signatories to the arbitration agreement. Acknowledging the general rule that "a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit," *Barrowclough,* 752 F.2d at 937–38, the court nevertheless held that the contingent beneficiaries were obligated, along with the stockbroker, to arbitrate their derivative claims. *Id.* at 938–39. The court's holding as to the contingent beneficiaries, however, was premised on the fact that the beneficiaries "claim[ed] no present entitlement to the [stockbroker's] deferred compensation and press[ed] no claims separate from his." *Id.* at 938. Accordingly, the *Barrowclough* court viewed the joinder of the contingent beneficiaries as co-plaintiffs in the stockbroker's lawsuit as incidental to the core claim, which it characterized as a simple "dispute between an employer and an employee arising out of the employment relationship that should be subject to the employee's agreement to arbitrate." *Id.* at 939.

Similarly, in *McMahon,* the federal district court took pains to acknowledge that it "underst[ood] that arbitration clauses are ... contractual agreements and that, as a general proposition, persons who are not parties to a contract are not bound by the provisions of that contract." *McMahon,* 697 F.Supp. at 493. As in *Barrowclough,* the *McMahon* co-plaintiff was suing under the same theory as—and as an alleged agent of—the primary plaintiff, from whose injury her claim was derived. For that reason, the *McMahon* court regarded the case before it as an exception to the general rule, observing that "[the co-plaintiff spouse] allege[d] no entitlement to damages distinct from those allegedly suffered by her [plaintiff] husband and

base[d] her entitlement [on] allegations that she was her husband's business partner and that she ha[d] a vested interest in all commissions and other income earned by [him] through his employment by and affiliation with [the] defendants." *Id.* at 494 (internal quotation marks omitted). The court followed the converse of the reasoning of *Hughes Masonry Co. v. Greater Clark County School Bldg. Corp.*, 659 F.2d 836 (7th Cir.1981), which held that "it would be 'manifestly inequitable'" to allow a party to sue another for breach of a contract containing an arbitration agreement—to which the other was not a signatory—and at the same time to maintain that the party sued was not entitled to invoke the arbitration agreement. *McMahon,* 697 F.Supp. at 494. Accordingly, the *McMahon* court held that the co-plaintiff spouse was bound by the arbitration agreement to which her husband was a party.

Consistent with *McMahon,* the court in *Mutual Benefit Life Ins. Co. v. Zimmerman,* 783 F.Supp. 853 (D.N.J.), *aff'd,* 970 F.2d 899 (3d Cir.1992), espoused the rule that "[n]on-signatories of a contract ... may ... be subject to arbitration if the nonparty is an agent of a party or a third party beneficiary to the contract." *Id.* at 865 (citing *Arnold v. Arnold Corp.-Printed Communications for Business,* 920 F.2d 1269, 1281 (6th Cir.1990); *Barrowclough, supra; Scher v. Bear Stearns & Co.,* 723 F.Supp. 211, 216 (S.D.N.Y.1989); *Farmers & Merchants Bank v. Hamilton Hotel Partners of Jacksonville, Ltd.,* 702 F.Supp. 1417, 1425 (W.D.Ark.1988); *Cauble v. Mabon, Nugent & Co.,* 594 F.Supp. 985, 991–92 (S.D.N.Y.1984); and *Okcuoglu v. Hess, Grant & Co.,* 580 F.Supp. 749, 751 (E.D.Pa.1984)).

The critical distinction between a co-plaintiff (such as those in *Barrowclough* and *McMahon* ) asserting contract claims as the *agent* or functional equivalent of a primary plaintiff who is a party to the contract containing an arbitration agreement, on the one hand, and a co-plaintiff asserting claims that are *distinct and separable* from those of a primary plaintiff who is a party to an arbitration agreement, on the other, appears to account for the results reached in *Hays and Co. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 885 F.2d 1149 (3d Cir.1989), and *Merrill Lynch, Pierce, Fenner, & Smith, Inc. v. Longoria,* 783 S.W.2d 229 (Tex.Ct.App. 1989).[18] In *Hays,* the court was faced with a securities broker's motion to compel arbitration of claims that a bankruptcy trustee had asserted against it. The trustee alleged both securities violations, arising out of prior business transactions between the bankrupt and the defendant broker, and claims of fraudulent conveyance and constructive trust, which the trustee brought pursuant to powers conferred under federal bankruptcy law. The *Hays* court held that the trustee was bound by the arbitration agreement signed by the debtor only to the extent that the trustee's claims were inherited from the debtor:

> We hold that the trustee-plaintiff *stands in the shoes of the debtor* for purposes of the arbitration clause and that the trustee-plaintiff is bound by the clause to the same extent as would the debtor. We also hold that the trustee's ... [fraudulent conveyance and constructive trust] claims are not arbitrable under the arbitration clause because they are not derivative of the debtor and the trustee is accordingly not bound by the [arbitration agreement] with respect to them.

*Hays,* 885 F.2d at 1153 (emphasis added).

The *Longoria* court similarly highlighted the foregoing distinction in its holding that a co-plaintiff spouse, who claimed loss of consortium as a result of the defendant's alleged wrongful termination of her husband, was not obligated to arbitrate her claim. The court acknowledged that "[a]ll of [the

18. *Longoria* is virtually on all fours with the present case in certain material respects. In *Longoria,* "Merrill Lynch, Pierce, Fenner and Smith requeste[d] relief from a trial court order denying its motion to compel arbitration." 783 S.W.2d at 230. "Paul and Pat Van Meter, the real parties in interest, filed suit against Merrill Lynch complaining that Paul ... was wrongfully terminated from his employment with the bro-

kerage firm. Merrill Lunch filed a motion to compel arbitration alleging that Paul ... had completed and executed [an arbitration agreement] in conjunction with his employment application." *Id.* In the Van Meters' lawsuit, Pat asserted a claim for loss of consortium arising out of Merrill Lynch's wrongful conduct directed at Paul. *Id.* at 231.

spouse's] claims are derivative in nature, arising solely from her husband's contract with [the defendant]. However, because she was not a party to the contract, she is not bound to proceed to arbitration." *Longoria,* 783 S.W.2d at 231. In reaching its decision, the Texas court distinguished *In re Oil Spill by the Amoco Cadiz,* 659 F.2d 789 (7th Cir. 1981). In *Cadiz,* the claimant had also sought the right to a judicial forum because it had not consented to arbitration. But, unlike the matter before the *Longoria* court, the claimant in *Cadiz* "was attempting to recover as an agent." *Longoria,* 783 S.W.2d at 231. Because "recovery as an agent would necessarily be limited to that amount recoverable by the principal," the claimant in *Cadiz* was understandably bound by the arbitration agreement that had been signed by the principal. *Id.* By contrast, the claim of the co-plaintiff spouse in *Longoria* was "dependent upon her husband's in the sense that it derive[d] from the alleged wrongful termination, but the bases of her damages [were] totally separate from the damages [her husband] would claim for breach of contract or wrongful termination." *Id.*

We are persuaded by the logic of *Hays* and *Longoria.* In the present appeal, Lou is asserting her claims neither as an agent for her husband nor pursuant to a "derivative" and contract-based theory of recovery, such as that of a third party beneficiary. As distinguished from Drake, Lou has not contracted to arbitrate any dispute with KFC. Although her claims are "derivative" in the sense that they arise out of an alleged tortious injury to Drake sustained during his employment with KFC or upon his termination therefrom, they are separable from his, and her potential damages are not coextensive with his. We therefore hold that, to the extent that she is not pursuing claims as Drake's agent or under a breach of contract theory (pursuant to which she stands in Drake's shoes), Lou is not bound by the arbitration agreement between Drake and KFC. However, because (1) the viability of Lou's claims is conditioned upon KFC's liability to Drake, *see Towse,* 64 Haw. at 637, 647 P.2d at 705, (2) Drake is bound by the

arbitration agreement with KFC, *see* sections III.E. and F. of this opinion, *infra,* and (3) the issue of KFC's liability to Drake will determined by arbitration, we further hold that trial of Lou's claims must be stayed pending the disposition of Drake's arbitrable claims. *See* HRS § .658–5 (1993) ("If any action . . . is brought upon *any issue* referable to arbitration under an agreement in writing, the circuit court, upon being satisfied that *the issue* involved in the action . . . is referable to arbitration under such an agreement in writing, shall stay the trial of the action . . . until the arbitration has been had in accordance with the terms of the agreement[.]" (Emphases added.)).[19]

**E.** *The Arbitration Agreement Extends To All Of The Claims Asserted In Drake's Complaint Relating To His Alleged Termination From Employment With KFC Notwithstanding That The Arbitration Agreement Is Not Contained Within A Written Employment Contract.*

The Alabanzas next urge that the arbitration agreement cannot forestall their lawsuit against KFC because the agreement was contained within Drake's employment application, which—as the parties agree—was not itself a binding employment contract. In other words, the Alabanzas reason that, insofar as their dispute with KFC does not "arise out of" the arbitration agreement, but, rather, "arises out of" a subsequent oral employment contract, the dispute is beyond the scope of the arbitration agreement. To the extent that their argument concerns the significance of an oral employment contract under Hawai'i law, we have already disposed of it *supra* in section III. C.1. of this opinion. Their position, however, also implicates elements of controlling federal and other relevant law, which we now address.

We discern three facets of the Alabanzas' argument that the arbitration agreement does not extend to the present dispute, even under the FAA. First, the Alabanzas call our attention to the fact that, "[w]hen it drafted the employment application, . . .

---

**19.** Of course, pursuant to HRS ch. 658, the parties are free to arbitrate Lou's claims against KFC along with Drake's should they choose to do so.

KFC worded it to leave no doubt that [Drake's] employment, if it happened, did not arise out of this employment application or any other written contract." By this we understand the Alabanzas to mean that the employment application was not an employment contract—a fact, as we have repeatedly noted, that is not in dispute—and therefore could not govern controversies arising out of Drake's employment.

Second, the Alabanzas level a direct attack on the validity of the arbitration agreement by insisting that "KFC cannot be permitted to take inconsistent positions by stating that[,] despite specific language to the contrary, the Employment Application they drafted [is] somehow a valid, enforceable, and irrevocabl[y] binding contract." Put differently, the Alabanzas advance the view that the arbitration agreement is not severable from the employment application and therefore cannot govern disputes arising out of Drake's subsequent contractual relation with KFC.

Third, the Alabanzas insist that "KFC has no right to force [Drake] to arbitrate disputes which arose out of his subsequent, oral employment contract, based on an arbitration clause in a separate written 'contract' (the application) out of which no dispute arose."[20] In other words, the Alabanzas maintain that the arbitration agreement cannot be imported into the complex of rights and obligations comprising Drake's subsequent and oral contractual relationship with KFC, such that he can be compelled to arbitrate issues relating to his alleged termination from employment.

We therefore examine whether under federal law or otherwise: (1) the arbitration agreement can govern disputes arising out of Drake's subsequent oral contract of employment with KFC; (2) the arbitration agreement is severable from the remaining provisions of the writing, *i.e.*, the employment application, in which it is contained; and (3) the absence of a contemporaneous and written employment contract places the present dispute beyond the scope of the arbitration agreement.

### 1. *The legal effect of the arbitration agreement*

Although the public policy underlying Hawai'i law "strongly favors arbitration over litigation, the mere existence of an arbitration agreement does not mean that the parties must submit to an arbitrator disputes which are outside the scope of the arbitration agreement." *Norris,* 74 Haw. at 259, 842 P.2d at 645 (citing *Koolau Radiology, Inc., supra*). Federal law is in accord: " '[A]rbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit.' " *AT & T Technologies v. Communications Workers of Am.,* 475 U.S. 643, 648, 106 S.Ct. 1415, 1418, 89 L.Ed.2d 648 (1986) (quoting *United Steelworkers v. Warrior & Gulf Navigation Co.,* 363 U.S. 574, 582, 80 S.Ct. 1347, 1353, 4 L.Ed.2d 1409 (1960)).

"[W]hen the arbitration clause is clear and unambiguous . . . its interpretation is a question of law which may be made by the appellate court. . . . Consequently, we are free to interpret the arbitration clause and apply the correct law to its enforcement." *Koolau Radiology, Inc.,* 73 Haw. at 447, 834 P.2d at 1301 (quoting *Beclar Corp. v. Young,* 7 Haw.App. 183, 190, 750 P.2d 934, 938–39 (1988)) (original brackets and internal quotation marks omitted). *See also Simbajon,* 81 Hawai'i at 197, 914 P.2d at 1390. Correlatively, "[w]hat issues, if any, are beyond the scope of a contractual agreement to arbitrate depends on the wording of the contractual agreement to arbitrate." *Rainbow Chevrolet, Inc. v. Asahi Jyuken (USA), Inc.,* 78 Hawai'i 107, 113, 890 P.2d 694, 700 (App. 1995).

On *de novo* review, we believe that the arbitration agreement, by its plain language, demonstrably extends to "controversies" arising out of alleged wrongful termination. Nevertheless, this court has stated that a

---

20. The Alabanzas' insistence in this regard would seem to rely on the language of HRS § 658–1, which, as we have noted, appears to address the arbitrability of controversies arising out of a "written contract." *See supra* note 7. We have

held, however, that the FAA governs Drake's dispute with KFC and, to the extent that the FAA is in conflict with HRS ch. 658, the former preempts the latter. *See* section III.A. of this opinion, *supra*.

contract " 'should be construed as a whole and its meaning determined from the entire context and not from any particular word, phrase, or clause.' " *Hawaiian Isles Enters. v. City and County of Honolulu,* 76 Hawai'i 487, 491, 879 P.2d 1070, 1074 (1994) (quoting *Maui Land and Pineapple Co. v. Dillingham Corp.,* 67 Haw. 4, 11, 674 P.2d 390, 395 (1984)). We therefore look to the arbitration agreement within the greater context of the document in which it is located in order to determine whether any party to it could reasonably have failed to understand that it was intended to govern the entire galaxy of employment-related controversies.

As we have indicated in section I. of this opinion, the arbitration agreement is contained in a discrete section of the application, denominated "Agreement." The Agreement is boxed off from the other sections of the application. Moreover, the Employee Rights subsection, in which the arbitration agreement is located, is set off from the preceding paragraphs of the Agreement by its own subheading, labeled "Arbitration Of Employee Rights." The signature line prepared for the applicant appears just below the arbitration agreement. The arbitration agreement references neither the remainder of the employment application in general nor the other provisions of the Agreement in particular, all of which are distinct in subject matter from the arbitration agreement.[21]

A disclaimer appears in the second paragraph of the Agreement, but it is exclusively limited to the applicant's acknowledgment that "I am hereby informed and I understand that nothing contained in this application . . . shall constitute an implied or expressed contract of employment." In our view, the disclaimer could not reasonably be construed to render nugatory the other provisions of the Agreement, *see supra* note 21, including the arbitration agreement located in the Employee Rights subsection.

Viewed in context, the arbitration agreement highlights—rather than camouflages—its general purpose, and the limited scope of the disclaimer is clear and unambiguous: the arbitration agreement obviously relates to the future possibility of employment and, in the event of employment, to employment-related controversies. The arbitration agreement expressly provided, in terms accessible to any literate English speaking applicant, that he or she "agree[d] to submit to binding arbitration" all possible future controversies "concerning . . . termination of employment[.]" The undisputed fact that the employment application did not, in itself, constitute an employment contract in no way undermines this simple reality.

2. *Severability of arbitration provisions*

For almost forty years, arbitration agreements have been regarded, as a matter of federal law, as severable and distinct from the underlying agreement. *Devonshire Fabrics,* 271 F.2d at 410. Accord *Municipal Energy Agency v. Big Rivers Elec. Corp.,* 804 F.2d 338, 342 (5th Cir.1986) ("An arbitration clause is separable from the contract in which it is embedded."); *Matterhorn, Inc. v. NCR Corp.,* 763 F.2d 866, 868–869 (7th Cir. 1985) ("An arbitration clause will often be 'severable' from the contract in which it is embedded. . . . If the agreement of one party to arbitrate disputes is fully supported by the other party's agreement to do likewise, there is no need to look elsewhere in the contract for consideration for the agreement to arbitrate[.]"); *Ericksen, Arbuthnot, McCarthy, Kearney & Walsh, Inc. v. 100 Oak Street,* 35 Cal.3d 312, 197 Cal.Rptr. 581, 585–86, 673 P.2d 251, 255–56 (1983) (citing *Moses H. Cone Memorial Hosp.,* 460 U.S. at 24–25, 103 S.Ct. at 941–42; *Prima Paint Corp. v. Flood & Conklin Mfg. Co.,* 388 U.S. 395, 402–04, 87 S.Ct. 1801, 1805–06, 18 L.Ed.2d 1270 (1967); and *Devonshire Fabrics,* 271 F.2d at 409).

---

**21.** The remaining seven provisions of the Agreement recite that: (1) the applicant understands that employment, if offered, is employment at will; (2) the application is not an offer of or contract for employment; (3) the applicant represents that he or she does not use drugs and agrees, if employed, to submit to drug testing; (4) the applicant has furnished complete and truthful information on the application; (5) KFC is authorized to conduct various investigations into the applicant's background and character; (6) the applicant authorizes and releases information to KFC from various sources; and (7) the applicant agrees that a photocopy of the application may be relied upon by others as valid.

In its opening brief, KFC cites to numerous jurisdictions that have upheld and enforced arbitration agreements encapsulated within underlying agreements, including *Mago v. Shearson Lehman Hutton, Inc.*, 956 F.2d 932 (9th Cir.1992); *Katz v. Shearson Hayden Stone, Inc.*, 438 F.Supp. 637 (S.D.N.Y.1977); and *White–Weld, supra*. Indeed, in a dispute involving age discrimination, the United States Supreme Court has recently upheld an arbitration provision embedded in a similar agreement. *Gilmer, supra*. Despite the Alabanzas' accurate observation that all of these decisions, including *Gilmer*, concern securities exchange applications—within the context of a highly regulated industry—as opposed to employment contracts, the decisions nevertheless support the general proposition that an arbitration agreement is severable from the writing in which it is embedded. And, as demonstrated *supra* in section II.B. of this opinion, arbitration agreements governed by the provisions of the FAA are, subject to the section 1 exclusion, enforceable with respect to employment contracts.

### 3. *Absence of a contemporaneous and written employment contract*

The fact that the arbitration agreement is not geographically ensconced in a contemporaneous and written employment contract, while potentially relevant to the application of HRS § 658–1 to a dispute not controlled by the FAA, *see supra* notes 7 and 20, is immaterial to the present appeal. It is tautological that the arbitration agreement, by its terms, interposed a future employment relationship between Drake and KFC as a condition precedent to the parties' contractual obligation to arbitrate any controversies arising out of that relationship. The presence of a condition precedent in the arbitration agreement, however, merely required that it be fulfilled before the obligation to arbitrate ripened. *See* Restatement (Second) of Contracts § 224 (1981) ("A condition is an event, not certain to occur, which must occur, unless its non-occurrence is excused, before

performance under a contract becomes due.") The fact that the mutual promises to arbitrate were executory at the time they were made merely signifies that Drake's obligation to arbitrate employment-related controversies with KFC, and vice versa, did not mature until he was hired and, in this case, was allegedly terminated. Restatement (Second) of Contracts § 232 (1981) ("Where the consideration given by each party to a contract consists in whole or in part of promises, all the performances to be rendered by each party taken collectively are treated as performances to be exchanged under an exchange of promises, unless a contrary intention is clearly manifested.")

### 4. *Summary*

Based on the foregoing analysis, we hold that the arbitration agreement between Drake and KFC—which was severable and distinct from the remainder of the employment application—was a valid agreement that, in the event of a future employment relationship (whether evidenced by a written employment contract or not), contractually bound Drake and KFC to arbitrate the galaxy of controversies that could potentially arise out of Drake's termination from that employment relationship.

### F. *The Arbitration Agreement Is Not An Unenforceable Contract Of Adhesion Under Either Hawai'i Or Federal Law.*

Relying primarily on *Leong v. Kaiser Found. Hosp.*, 71 Haw. 240, 788 P.2d 164 (1990), and *Gilmer, supra*, the Alabanzas assert as a backup position that, whatever its validity might otherwise be, the arbitration agreement is an unenforceable contract of adhesion, thereby relieving them of any obligation to arbitrate their claims against KFC.[22] For the reasons set forth below, we disagree.[23]

### 1. *Hawai'i law of contracts of adhesion within the context of arbitration agreements*

Under Hawai'i law, an unenforceable contract of adhesion

---

**22.** In light of our analysis *supra* in section III.D. of this opinion, the issue is, of course, moot as to Lou.

**23.** The Alabanzas also advance several collateral arguments that arbitration is inherently unfair to employees. Specifically, they decry (1) the allegedly greater cost of arbitration as compared to

is a form contract created by the stronger of the contracting parties. It is offered on a "take this or nothing" basis. Consequently, the terms of the contract are imposed upon the weaker party who has no choice but to conform. These terms unexpectedly or unconscionably[24] limit the obligations and liability of the drafting party. . . .

. . . .

In contracts of adhesion, courts are concerned with terms which are oppressive to the weaker party and which serve to limit the obligations and liability of the stronger party. . . .

*Leong*, 71 Haw. at 247–48, 788 P.2d at 168–69 (citations and internal quotation signals omitted). In other words, a contract that is "adhesive"—in the sense that it is drafted or otherwise proffered by the stronger of the contracting parties on a "take it or leave it" basis—is unenforceable if two conditions are present: (1) the contract is the result of coercive bargaining between parties of unequal bargaining strength; *and* (2) the contract unfairly limits the obligations and liabilities of, or otherwise unfairly advantages, the stronger party. *See Buraczynski v. Eyring*, 919 S.W.2d 314, 318–21 (Tenn.1996) (citing *Leong* ). Arbitration agreements are not usually regarded as unenforceable contracts of adhesion because the second condition is generally lacking—that is, the agreement "bears equally" on the contracting parties and does not limit the obligations or liabilities of any of them, "but merely substitutes one forum for another." *Leong*, 71 Haw. at 248, 788 P.2d at 169 (citation and internal quotation marks omitted).

We assume (and KFC does not appear to contest) that, as the Alabanzas suggest, Drake was offered the possibility of employment on a "take it or leave it form [*i.e.,* the employment application] that had to be filled out and signed by [Drake] if he wanted to be considered for employment with KFC." Accordingly, the first of the *Leong* conditions is present in this case insofar as Drake's submission to the arbitration agreement was the result of coercive bargaining between parties of unequal bargaining strength.

However, arbitration agreements such as that at issue in the matter before us simply do not entail the second of the *Leong* conditions. KFC is neither entitled to breach any contractual term or condition of its employment relationship with Drake nor to inflict tortious injury upon him simply because Drake's claims that it did so will be resolved around an arbitrator's table rather than in a court room. In other words, the record before us is devoid of any showing that the forum-substitution effected by the arbitration agreement either limits KFC's obligations and potential liabilities to Drake or otherwise confers an unfair advantage upon KFC.

litigation, (2) the alleged elimination of the opportunity for class actions, and (3) the alleged general pro-employer bias of arbitrators. These arguments are without merit. As to the first argument, *see Richardson v. Sport Shinko (Waikiki Corp.)*, 76 Hawai'i 494, 510, 880 P.2d 169, 185 (1994) ("It is well-established that, in most instances, the longer a case is in litigation, the more expensive it is for the parties. Thus, we have recognized time and again that 'the proclaimed public policy of our legislature is to encourage arbitration as a means of settling differences and thereby avoid litigation.' *Leeward Bus Co. v. City & County of Honolulu*, 58 Haw. 64, 71, 564 P.2d 445, 449 (1977) (citation omitted)."). As to the second argument, *see Gilmer*, 500 U.S. at 32, 111 S.Ct. at 1655 ("[A]rbitrators . . . have the power to fashion equitable relief. . . . [E]ven if the arbitration could not go forward as a class action or class relief could not be granted by the arbitrator, . . . arbitration agreements [do] not preclude [the relevant governmental agency, if any] from bringing actions seeking class-wide and equitable relief." (Citation and internal quotation marks omitted.));

HRS § 368–11(b) (1993) ("A complaint may be filed on behalf of a class by the attorney general or the [HCRC], and a complaint so filed may be investigated, conciliated, heard, and litigated on a class action basis."). As to the third argument, *see Gilmer*, 500 U.S. at 30, 111 S.Ct. at 1654 (" '[W]e decline to indulge the presumption that the parties and arbitral body conducting a proceeding will be unable or unwilling to retain competent, conscientious and impartial arbitrators.' " (Quoting *Mitsubishi Motors Corp.*, 473 U.S. at 634, 105 S.Ct. at 3357–58.)); HRS § 658–9 (1993) ("In any of the following cases, the court may make an order vacating the award, upon the application of any party to the arbitration: . . . (2) Where there was evident partiality . . . in the arbitrators, or any of them[.]").

24. "One-sidedness" is a basic element of unconscionability; a contract is unconscionable, *inter alia*, if it is "unjustly disproportionate" in its allocation of rights, benefits, obligations, or liabilities. *See Lewis v. Lewis*, 69 Haw. 497, 502, 748 P.2d 1362, 1366 (1988).

## 2. *Federal law of contracts of adhesion within the context of the FAA*

Most of the early federal jurisprudence that addressed claims that arbitration agreements, otherwise governed by the FAA, were contracts of adhesion developed within the context of disputes between members of various securities exchanges and their employers. These decisions rejected the argument of exchange members that the arbitration agreement at issue should not be enforced because it was involuntarily foisted upon the member by a party of superior bargaining power. *See, e.g., Webb v. R. Rowland & Co.,* 800 F.2d 803, 807 (8th Cir.1986) ("[Arbitration] [a]greements are not invalid as contracts of adhesion. The use of a standard form contract between two parties of admittedly unequal bargaining power does not invalidate an otherwise valid contractual provision. To be invalid, the provision at issue must be unconscionable. We have previously observed in a similar context: 'There is certainly nothing inherently unfair about the arbitration clause.'" (Citation omitted.)); *Katz,* 438 F.Supp. at 641 ("Plaintiff disputes the validity of the arbitration provisions, arguing that [they constitute] a contract of adhesion foisted upon him without choice by a party of superior bargaining power. This contention was pressed and rejected in *Rust v. Drexel Firestone, Inc.,* 352 F.Supp. 715 (S.D.N.Y.1972)[,] after full examination of the identical arbitration provisions and underlying judicial ... policies involved."); *Rust,* 352 F.Supp. at 718 ("Under all the circumstances, it cannot be said that the arbitration requirement as a condition of employment constitutes duress or that the employer has taken unjust economic advantage of the employee.").[25]

In *Gilmer, supra,* which likewise involved claims asserted by a securities representative (registered with the New York Stock Exchange) against his employer, the United States Supreme Court expressly approved and adopted the view permeating the federal court system. Acknowledging the representative's argument that, by virtue of the "unequal bargaining power between employers and employees," he should not be bound by the arbitration agreement appearing in his registration application, the *Gilmer* Court ruled that "[m]ere inequality in bargaining power ... is not a sufficient reason to hold that arbitration agreements are never enforceable in the employment context." *Gilmer,* 500 U.S. at 33, 111 S.Ct. at 1655. The Court reiterated that, " '[b]y agreeing to arbitrate a statutory claim, a party does not forgo the substantive rights afforded by the statute; it only submits to their resolution in an arbitral, rather than a judicial, forum.' " *Id.* at 26, 111 S.Ct. at 1652 (quoting *Mitsubishi Motors Corp.,* 473 U.S. at 628, 105 S.Ct. at 3354).[26]

Thus, the federal courts, including the United States Supreme Court, have rejected the "inequality of bargaining power" argument advanced by the Alabanzas in this case when determining the applicability of the FAA to arbitration agreements between employers and employees. Neither *Gilmer* nor any other federal authority of which we are aware stands for the proposition that inequality of bargaining power between employers and employees, without more and however great, may render an arbitration agreement unenforceable as a contract of adhesion.[27]

### 3. *Summary*

Based on the foregoing analysis, we hold that the arbitration agreement between Drake and KFC is not an unenforceable contract of adhesion under either Hawai'i or federal law.

## IV. CONCLUSION

With respect to Lou Alabanza's claims of loss of consortium and negligent and inten-

---

**25.** The federal courts have reached the same conclusion with respect to disputes between investors and stock brokerage houses. *See, e.g., Cohen v. Wedbush, Noble, Cooke, Inc.,* 841 F.2d 282, 286 (9th Cir.1988) ("We have previously held that state law adhesion contract principles may not be invoked to bar arbitrability of disputes under the [FAA]. We reaffirm that holding today.") (Citing *Bayma v. Smith Barney, Harris*

*Upham & Co.,* 784 F.2d 1023, 1024 (9th Cir. 1986)).

**26.** *See supra* note 14.

**27.** We note that the *Gilmer* Court observed that " '[o]f course, courts should remain attuned to well-supported claims that the agreement to arbitrate resulted from the sort of fraud or over-

tional infliction of emotional distress (fourth and fifth claims for relief), the circuit court's decision and order denying KFC's motion to compel arbitration is affirmed. With respect to Drake Alabanza's claims (first, second, third, sixth, and eighth claims for relief), the decision and order is vacated and remanded to the circuit court with instructions to enter an order granting KFC's motion, in accordance with the terms of HRS § 658–3.

whelming economic power that would provide grounds for the revocation of any contract.' " *Gilmer,* 500 U.S. at 33, 111 S.Ct. at 1656 (quoting *Mitsubishi Motors Corp.,* 473 U.S. at 627, 105 S.Ct. at 3354) (some internal quotation marks omitted). Unfortunately, to our knowledge, the Supreme Court has never defined the phrase "overwhelming economic power." In any event, we are aware of no authority supporting the Alabanzas' contention that Drake's bargaining position with KFC was "weaker" than that of a securities salesperson vis-a-vis a securities exchange or brokerage house. Be that as it may, and when all is said and done, we believe that the Alabanzas are drawing a distinction without difference; obviously, few applicants for employment have any meaningful alternative but to "buy into" a non-negotiable agreement to arbitrate potential future employment-related controversies, unless, of course, the applicant is willing to forego the job opportunity altogether. But, as discussed above, inequality of bargaining power, *in and of itself,* does not transform an agreement to arbitrate employment-related controversies into an unenforceable contract of adhesion. *Cf. Broemmer v. Abortion Services of Phoenix, Ltd.,* 173 Ariz. 148, 840 P.2d 1013 (1992) (holding an arbitration agreement to be unenforceable because it was forced upon the weaker party by the stronger on a take-it-or-leave-it basis *and* unconscionably conferred unilaterally advantageous terms upon the stronger).